Chief Justice Robertson,
delivered the opinion of the Court.
On the 29th oí October, 1818, Isaac Clark sold and conveyed to Robert Crocket, a tract of land in Christian county., containing 880 acres, in consideration whereof, Crocket executed to Clark two promissory notes for $2,660 each, without securing personal or real, other than the lien which equity created; one of the notes was payableon the 15th of August, 1819, and the other on the 15th of August, 1820.
On the 19th of October, 1819, Robert Crocket mortgaged to John W. Hunt'the trart which he purchased from Clark, another trad of 1425 acres in the same county, and two tracts in Jessamine, to secure the payment of $33,760 82 cents, in six annual in-stalments of unequal portions.
On the 19th of November, 1822, Crocket made an "absolute deed to Hunt for the two Christian tracts of land included in the nnortgage, acknowledging a consideration of $22.850. And on the 9th of July, 1823, hp executed adped releasing to Hunt, his equity of redemption ity the same two tracts of land, and ex1 pressing as .the entire consideration, $1, and thé discharge of the mortgage»
In December 1822, the tract of 880 acres in Christian, was sold by virtue of a fieri facias against Crocket, in favor of the Bank of Kentucky, and purchased by Strother J. Hawkins as agent of the bank» At the instance of Crocket, the bank released all its right to the land to Hunt bv deed, bearing date 30th June, 1823.
*554 lEarly in January, 1820, (he mortgage was acknowledged and lodged with the clerk of the court ot appeals to be recorded; but jt was not deposited in ‘the clerk’s office of Christian, until the 28th oí December, 1822.
in April, 1S20, Clark obtained a judgment against Crocket on the note which first became due, and in April 1821, he obtained judgment on the other. The executions which were issued on each of these judgments were replevied, and executions were after-wards issued on the replevin bonds; on one of these the return was “no property,” that on the other was “injoined”
On the 21st of April, 1825, this suit in chance-rj" was instituted by Clark against Crocket, Hunt and Hawkins for the purchase, enforcing an equitable lien which Clark insists that he retains in the land which he conveyed to Crocket.
The bill alleges the foregoing facts in substance, and charges a fraudulent conbination between Crock-et and Hunt, to defeat the honest claims of Clark and other “bona fide1’’ creditors of Crocket.
Crocket’s answer admits the material allegations of the bill, except that imputing fraud, and he affirms in it, that he told Hunt, before be made to him the mortgage, that he owed Clark for the land.
Hawkins states in his answer, that he purchased as the agent of the bank, and had notice before he purchased, of the equity of Clark, and that he would rely on it.
Hunt avers in his answer, that the mortgage was •made to him “bona fide,” to secure to him the debts which are described in it, and that he had no notice of Clark’s equitable lien, or of .Crocket’s owing him any thing until after the execution of the mortgage. He states, that for the accommodation of Crocket, he released his mortgage on the Jessamine land, and took 'a conveyance of the absolute title to a tract of about 1100 acres in Logan, and the release of Crocket’s equity of redemption to the two Christian tracts, in satisfaction of the mortgage. He relies on the mortgage, the release by Crocket ol his equity of redemption, and the deed from the bank, as the grounds of *555 ñis title, and does not mention, or allude to the deed dated 19th November, 1819. He then makes the following admission:
“This defendant will admit that previous to the date of the release from Crocket to him, he did hear that the complainant represented himself to be a creditor fora part of the price of the land sold by him to Crocket, and that he insisted the land was bound for it. But this information was long after the date of the mortgage, and within a few months preceding the. release. And this defendant saw no document on the ■subject, has never understood that oiTe was to be found, was still ignorant as to the amount, and was advised that whatever the hardships to the complainant, it was of no personal interest to this defendant.” Onlv two depositions were filed in the cause, that of Robert Crocket, and one of John Clark taken in Missouri, which last the circuit court rejected as inadmissible. A sufficient reason for the rejection of this deposition has not been suggested by counsel, nor perceived by this court. It will therefore be considered as competent evidence.
Crocket swears that he notified Hunt before the execution of the mortgage, that he owed Clark for the land: that he owed Hunt, and proposed to let him have the land in satisfaction of the debt; that Hunt having inspected the land, declined the purchase of it, but proposed to sell to Crocket a house and a few acres of appurtenant ground near Mountsterling, for $10,000 on a credit, and to take the mortgage, which was afterwards given, to secure the whole debt thus to be augmented by the $10.000; and that having acceded to Hunt’s proposition, he accordingly executed the mortgage.
He also swears, that wishing afterwards to release the Jessamine land from the mortgage, he proposed to substitute the Mountsterling property; but that Hunt refused to make the exchange, alleging, as an. excuse, that the Jessamine land wa< worth more than the Mountsterling property; and that he was compelled (for the purpose of procuring the release of the Jessamine land,) to make to Hunt an absolute deed for the two Christian tracts, and the Logan tract, and pay him four tons of iron and a horse, in full die-* charge of the mortgage.
Act of-’19, which requires mortgages and Seeds ol trust, to be deposited in office.'of clerk of the county court, of the county in which the property lies, within sixty days after their execution, is prospective in its operation.
The Logan land he estimates at $7,000; but Hunt' ’n ^'s aliswer> Siivs ^a*- R was worth about $2,000. Clark swears that he notified Hunt of the equitable lien of Isaac Clark, in May i 320, and that after-wards, in the summer of 1822, he gave a similar notice to the agent of Hunt, who visited Christian to purchase from Crocket for Hunt, the tract of land which Crocket had purchased from Isaac Clark.
On the hearing, the circuit court dismissed the bill, and Clark appealed to this court.
The counsel for the appellant relies on two ground* for reversing the decree.
1st. The mortgage was not lodged in the clerk’s office of Christian county to be recorded, within eight months after its execution, and is therefore void, as against the creditors of Crocket.
2d. The existence of an equitable lien on the land for the consideration, and of a notice of that lien to Hunt, before the execution of the mortgage tc him.
The first position is not tenable. The law in force at the date of the mortgage, only required a deed or mortgage of land to be proved or acknowledged, and deposited for registration, either in the clerk’s office of the county in which the land should lie, or in that of the court of appeals or federal court.
The act of December, 18l9, which requires mortgages and deeds ol trust, of either real or personal estate, to be deposited on proofor acknowledgment, ‘‘in the office of the county court clerk, of the county, where the estate therein conveyed, or the greater part thereof lies,” wfithin sixty days after their execution, is prospective in operation, and can therefore, have no effect on the mortgage in this case. It w'as acknowledged and left wfith the clerk of the court of appeals for record, in less than sixty days after its date, and was recorded in his office according to law.
But there is more solidity in the 2nd ground. The principle of an equitable lien by a vendor of land, is, that when he shall have conveyed the legal title to the vendee, without receiving the entire consideration, or without having taken any collateral security *557 ior the payment of it, or done* any other act which might indicate that he did not rely on the land fo>- his security, equity considers the vendee as holding the land in trust for him, until the full price for it shall have been paid.
Wht-re vendor of land, ha» conveyed the loyal title to vendee, wiihout receiving the entire consideration, or without having taken any collateral security for the payment of it,- or done any act which indicates that he did not rely on the land, for his 'security, equity considers vendee as' holding land in trust for vendor, and he has lien thereon until all Ihe purchase money is paid. But such lien only exists between the parties, and those having notice that the purchase money has not been paid,.
A bonafide purchaser of land from a vendee niii-the equitable lien of vendor for the pur-tected from, operation of such lien. So, also, a bo-mort' gairee of such vendee, is entitled to equal protection from such lien, if ho had no notice thereof.
*557 But the principiéis restricted to the parties themselves, and others having notice. A "bona fide” purchaser of the land trom the first vendee, without notice of tire equitable lien of the first vendor, will be protected against the operation of the lien, because ‘Hnforo conscientice,” he must be considered as holding a right paramount to that of a negligent and confiding vendor, who had been so incautious as to part with his title without securing the consideration by mortgage or sufficient personal guaranty, and had made his vendee the ostensible owner in equity, as well as the real owner in law of the land, and if this were not so, the law requiring deeds to be recorded would be a snare. The riile “caveat e.mptor,” applies only to purchasers of defective legal titles. A purchaser of the legal title is not tobe affected by any latent equity, whether founded on trust, fraud or otherwise, of winch he has not actual notice, or which does not appear in some deed necessury, on the deduction of title, so as to amount to a constructive notice. I. Washington’s Reports, 41.
A "bona fide” mortgagee of such vendee, is entitled, to equal prelection from the enforcement of such equitable lien, of the existence of which he had no notice at the date of his mortgage. The reasons which shield innocent purchasers, apply equally to innocent mortgagees. When the one class will be protected, the oilier should be, and “vice versa”
The case of Eubank vs. Poston, et al. V. Mon. 288, should silence all doubt on this point.
Then, as mortgagee, Hunt’s claim to the extent oj his debt, and so far as the 880 acres shall be necessary for the payment of it, should be preferred to the equity of Clark, unless Hunt had notice of Clark’s lien, when he took the mortgage; but if he had such no-lice, Clark’s equitable lien is superior to his legal lien under his mortgage, unless Clark has waived his lien,
It becomes therefore important, here to consider two questions. 1st. Pías Clark done any thing which *558 should he construed ‘into a waiver of his lien? 2d* Ifhe has not, had Hunt notice of that lien when he took the mortgage?
The rule 'caveat emptor,’ applies only to purchasers of defective leeal titles. But purchaser of the legal title, is not to be affected by any latent equity, whether founded on trust, fraud, or otherwise, of which he has not actual notice, or which does not appear in some deed, necessary in the deduction of title, so as to amount to constructive notice.
Vendor taking the individual notes, of vendee, for the purchase money, does not thereby waive his e-quitnble lien on the land, for the payment thereof.
Vendor’s equitable lien on the land, not discharg-ecl ^ ve"~ . *fgthíjndf-ments rendér-ecl 011 the foMhe'pnr-chase money,
*558 It is not pretended that there was any waiver either express or implied, of Clark’s lien before the date of the mortgage to Hunt. The taking of Crocket’s individual notes for the consideration, cannot uper $e,” he considered as a waiver of the lien on the land. This doctrine is two firmly established by reason as well as actions to need (he support at this day of citations from books. It is not controverted by Hunt’s counsel.
But if Clark has waived his lien since the date of the mortgage, or has done any thing which should have, in equity the effect of a surrender of it, he should not now be permitted to assert it.
The counsel for Hunt insist, that by replevying the executions on the judgment at law, Crocket discharged the equitable lien on the land. We cannot con* cur in this opinion, nor admit the conclusiveness of the arguments which were employed to enforce it.
The true rule of equity is, that the vendor retains his lien, unless he shall have done something which evinces his intention to abandon it, or have done something which manifests that he never relied on it,.or that he had abandoned it, the chancellor has no right to take it from him, on the speculations of comparative justice between him and a subsequent purchaser or mortgagee with notice of its existence.
Here there is not only nothing which tends to show that Clark never looked to his equitable lien for security; but there is every thing which is necessary to show that he relied on it, and has continued to persist in it as his ultimate resource.
He brought suits and obtained judgments on the notes as soon as he could do so; this was no implied waiver of his lien, it was only an experiment preparatory to a resort to a court of chancery, for enforcing the lien, if such a remedy should become necessary. Of course executions were issued on these judgments. Clark was desirous to make his money (as he should have been) without interfering with the claim of *559 Hunt to the land. The executions were replevied, and it is true that there is no return on either oí the executions on the replevin bonds, to prove the vency of all the obligors. One of these executions was injoined, and the other was issued to Bath coun-iy. They were both replevied in Jessamine. These facts would not, of themselves, authorize a suit in chancery by Clark, to subject the dioses in action, or equitable interests of Crocket to the satisfaction of his judgment. But his right to enforce his equitable lien on the land which he conveyed to Crocket, does not depend on the insolvency of Crocket, nor on that of his sureties in the replevin bonds. This right was coeval with the sale to Crocket, and might have been asserted in the first instance, without any resort to a common law remedy on the notes. An attempt in a court of common law, to coerce the payment of the consideration, cannot, unless that attempt shall have succeeded, deprive Clark of his equitable right in a court oí chancery. If Clark, by his voluntary con-tr^ct with Crocket, had, either before or after he obtained hisjudgment, accepted Crocket’s bonds with security, in lieu of his lien, he could not afterwards enforce the lien, even though the security taken, should prove tobe insufficient. And the reason, and only one is, because, by accepting the new security, he evinced a disposition to abandon his lien, and should not be allowed to hold a constructive lien after voluntarily taking other security. But the re-plevin bonds, which were the ordinary fruits of the legal remedies, cannot be construed to have the like effect. They do not operate as evidences of new ana voluntary contracts between Clark and Crocket, in substitution of the equitable lien. The execution of these bonds, does not indicate any intention by Clark to surrender his lien on the land. The utmost that a chancellor could do in such a case, would be to place Hunt in Clark’s situation when the latter insists on an enforcement of his lien, and to give Hunt the benefit of proceeding on the replevin bonds.
hUlTen «pon theland against all thereof unless he has done something hjsYntention8 ,0 abandon it, or shews that reli“ e 1'
Vendor of ]and> ®ay jjfthe./iret stance, to enforce bis equi-upon theland for the nur-chase money, upon thenotes given for the P“rchase m0“ ney"
We do not say that this should, or could be done. It Is not-necessary to express an opinion on such a power, as no question in relation to it, is made in this case. But if such power exist, the exercise of it would be as much as the chancellor could do for *560 Hunt, if there be no other obstacle to the relief sought by Clark, than the execution of the replevin bonds, or perhaps, if Hunt had shewn that Clark can make his money by proceeding on the replevin bonds, as it would then appear, that Clark has a double security, the chancellor might compel him to exhaust his legal security, before lie should encroach on Hunt by claiming the equitable lien. But before Hunt could ask this to be done, he should show that the legal security is available. Hunt has not attempted to make this appear, and '•'prima facie,” the bond could not have been enforced by Clark. He has manifested a desire to euforce them by execution, and has failed, ■and therefore, has resorted'to a remedy, the results of which was doubtful and contingent. And Hunt has not suggested the solvency of the obligors in either of the bonds, nor intimated that Clark could have made his money, or any portion of it by execution. If it were material, therefore, we would be authorized to decide that the legal remedies were ineffectual. HoweVer, it does not appear that they were, or could he availing.
Vendor's equitable lien or; (he land, is not discharged by vendee’s injoi'/iing (he judgments rendered upon the notes ¡riven for the pur* olíase money.
One witness is insufficient to establish a fact against the positive denial thereof in def’ts ans'wer.
The injunction cannot have more influence on Clark’s equity,than the replevin bonds should have. The considerations which have been suggested in relation to them, apply also, to the injunction bond. And Hunt has not intimated that the injunction is still pending. His silence, and the lapse of time are sufficient tojustify the opinion that the injunction has been discharged.
We tome, therefore, £o fhe 2nd question. Crock-et’s deposition, so far as notice before the mortgage would be necessary, if unsupported by any corroborating circumstance, or by any other proof, would not be sufficient to justify a decree in Clark’s favor ¡against the positive denial of notice in Hunt’s answer. For although (.’rocket’s deposition exhihifs intrinsic evidences of verity, whiehentitle it to the fullest credence^© one witness, however creditable, will be enough to countervail Hunt’s denial of notice.
But there are, in our opinion, some circumstances, which, in some degree, fortify Crocket’-s testimony a« to the notice.
*561 Hunt says, in his answer, that he had no notice until a few months before the date of the release by Crocket to him, which was in 1823. But not _p¡nly ■does John Clark swear that he gave him notice in 1820, but the pendency of the suits on the bonds in 1820 and 21, and the fact, that others had notice sooner than Hunt admits that he had, tend somewhat to induce the apprehension that he has been mistaken as to dates, and may have confounded notice of the existence of the debt by Crocket to Clark, with a direct notification of Clark’s intention to claim an equitable lien.
In one part of his answer, he states that the lien of which he had heard, was invalid. Without entering minutely into all the circumstances, we are content with the inference which we feel bound judicially to draw from them, that the efficacy of Hunt’s denial of notice in his answer, is so much diminished, that Crocket’s testimony should be admitted as sufficient to establish notice to Hunt before the date of the mortgage. The discrepancy between Blunt’s answer and John Clark’s deposition as to notice, has not been explained; and when such discrepancy is-established, the reason for requiring any more than Crocket’s testimony ceases to exist.
The counsel for Hunt have endeavored to reconcile his answer with the deposition of Clark, by assuming that Hunt only says “that the complainant told him” of his lien, only a few months before the release; but that he is silent as to notice by John Clark, in 1820. This explanation would not avail, even if the fact existed, which it assumes as its basis, for then the answer would be evasive, and would, therefore, be as much affected, as it can be, without the explanation.
But the counsel have misinterpreted Hunt’s answer; so much of the answer as can bear on this point, has heen quoted, and it -will be seen that'it says that ‘‘he did hear that the complainant represented himself to be a creditor.’’’’ not that the complainant told him so. A knowledge that the consideration, or a part of it is unpaid, is sufficient notice by a subsequent purchaser or mortgagee, to entirle the first dor holding the debt, to priority in equity. It is not' *562 necessary that there should he express notice, that there is an equitable lien, and that it will be insisted on. Notice of the existence of the debt is enough to awaken the vigiletice and affect the conscience of the party receiving it. Gibbons vs. Baddall, II. Eq. Ca. ab’r. 682. n. b.
The notice gi/on by Crocket was, therefore, sufficient. Hunt ■ ay have forgotten that Crocket told him that th onsideration had not all been paid, because, (believing, as wc think, if is probable, and as-, from his answer and conduct, it is almost certain he did, that the simple circumstance, that the whole con-' sideralion had not been paid, would not entitle Clark to such a lien on the land, as would overreach his mortgage,) the communication made but a transient impression,if any at all on his mind, and therefore, lie may have sworn very conscientiously, as we believe he has done, that he had no notice before the date of his mortgage.
Under all the circumstances of the case, we are inclined to the. opinion, that the chancellor should decide, that Hunt had notice of the lien of Clark before the date of his mortgage.
We acknowledge that we have felt some hesitation incoming to this conclusion; but if the case depended on this isolated question, the facts, although not as satisfactory as could be desired by a tribunal, whose highest duty it is to expound the law truly, and administer justice rightly, are such as to give to Ciarle the stronger claim to relief.
Bulthc ease does not depend alone on the notice before the date of the mortgage. The record exhibits another important circumstance, which, although, it has not been noticed in the argument, is, necessarily-embraced in. the general assignment of error. It is, that Hunt does uot now hold as mortgagee, bu,t as a purchaser by deed, bearing date, after the time, when both Crocket and Clark swear that he had notice of the lien.
If Hunt yet held as mortgagee, and it had not been, sufficiently proved that he had notice of the lien be-feye the execution ol the mortgage, then the chancellor would have compelled him to forclose his morC *563 gage and sell the mortgaged property; and if the property had been more than sufficient for the extinguishment of his debt, would have decreed to Clark the excess, or as much thereof, as would have been necessary to satisfy his debt, or in other words, the Clark tract would have been the last to be sold, and would not have been sold to satisfy Hunt’s debt, if the other property had been sufficient.
But Hunt has abandoned his mortgage, and has taken in lieu of it, a deed of release to a part of the mortgaged property, and an absolute deed to other property not included in the mortgage. Before he did this, he had notice of Clark's lien. This he does not deny, but admits in his answer. Two witnesses swear positively that he had notice before the completion of his final contract.
He ought to have elected, either to stand on his mortgage,.or if, (as he had a right to do,) he chose to transmute his mortgage into an absolute title, he should have left out the trai t conveyed by Clark to Crocket, unless his debt could not have been paid without including it.
Crocket swears that the whole estate mortgaged» was worth more than the whole debt due to Hunt* The Jessamine lands were released.
The court does not know, nor can it ascertain whether the property mortgaged would have been sufficient to satisfy the mortgage, without the sale of the Clark tract. Hunt has not suggested in his answer, that there was not enough to indemnify him without that tract. He has changed his attitude as mortgagee, for that of purchaser with notice, where-iy he has deprived Clark of theright which he otherwise would have had to contingent benefits of a foreclosure, and sale of the mortgage by a decree of the chancellor. This he ought not to have done if he could have avoided it. The “onus” devolved on him. He has not proved, nor even suggested that he could not have secured his debt out of the mortgaged estate, without taking the 880 acres in Christian. He estimated the Jessamine lands as more valuable than the property which he sold to Crocket for f> 10,000.
This-last ground strengthens the other, as to the notice before the date of the mortgage, and that fortifies-
Crittenden, for appellant; Wickliffe, and fflooley, for appellees.
this. Arid therefore, upon both united, we feel the more confidence, that the appellant is entitled to relief.
The deed from the'bank can have no effect. It was made after Hunt had notice, and the bank had notice before it made the purchase.
The deed from Crocket to Hunt, dated 19th November, 1822, is entitled to no influence; as the legal title was vested in Plunt by the mortgage, the absolute deed could pass nothing, except so far as it might amount to a release of the equity of redemption, and Hunt had notice before the date of rtiis deed; besides, he has not relied on, nor ever mentioned it in his answer.
Therefore, on the whole case, it is the opinion of this court, that the decree is erroneous.
Wherefore, the decree is reversed, and the cause remanded for a decree conformable to this opinion, and for such orders and decrees as may be proper for that end.